## DISTRICT COURT OF THE UNITED STATES
## DISTRICT OF KANSAS

SAKET KAPOR, PETER BROCKETT and
HIEU PHAN,

               Plaintiffs,

vs.

IVY INVESTMENT MANAGEMENT
COMPANY , WADDELL & REED
INVESTMENT MANAGEMENT
COMPANY, HENRY J. HERRMANN,
MICHAEL L. AVERY, JOSEPH  HARROZ,
JR., JOSEPH W. KAUTEN, JAROLD W.
BOETTCHER, JAMES D. GRESSETT,
GLENDON E. JOHNSON JR., ELEANOR B.
SCHWARTZ, MICHAEL G. SMITH,
EDWARD M. TIGHE, DAVID P.
GARDNER, JAMES M. CONCANNON,
JOHN A. DILLINGHAM, ROBERT L.
HECHLER, ALBERT W. HERMAN, and
FRANK J. ROSS JR.,

               Defendants,

IVY FUNDS and WADDELL & REED
ADVISORS FUNDS, Delaware Business
Trusts,

               Nominal Defendants.

No. _____

**DERIVATIVE COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs, by and through their undersigned counsel, allege as follows on information and belief:

### NATURE OF THE CASE

1.     This is a shareholder derivative action brought by investors in, and on behalf of, the Ivy Asset Strategy Fund (the "Ivy Fund") and the Waddell & Reed Asset Strategy Fund (the

"W&R Fund") (collectively, the "Funds"), two funds managed by the same portfolio managers, to recover at least $300 million, and perhaps as much as $925 million, of losses and other damages.  These damages were caused by Defendants' willful and gross breaches of fiduciary duty towards shareholders to i) prudently monitor and supervise the Funds' investments to meet the investment objectives as stated in the Funds' Prospectuses, ii) supervise the Funds' portfolio managers, and iii) rigorously enforce the Funds' compliance and ethical codes of conduct.

2.      Unbeknownst to investors, starting in or about April 2013, the Trustees permitted and approved purchases by Ryan Caldwell, one of the two portfolio managers of the Funds, of approximately $925 million of private securities in a start-up and potentially criminal company in the field of professional boxing promotion.  These purchases had no economic justification, but rather were motivated by Caldwell's personal interest and benefit.   In fact, Caldwell acknowledged at or about the time that this boxing promotion company faced short-term losses of hundreds of millions of dollars (the Funds' money), and personally attended business meetings on behalf of this company's shady entrepreneur, Alan Haymon, to pledge future financial support from the Funds.

3.      This private stock investment violated the stated terms of the Prospectuses for the Funds, which describe an investment strategy that "primarily focuses on securities issued by large capitalization companies," that "can offer a high probability of return or, alternatively, can provide a high degree of relative safety in uncertain times, with Strong cash flow streams: and "high sustainable cash flow."   Investing nearly a billion dollars of private securities in a start-up boxing promotion company, as high-risk a venture as one could imagine, meets none of these criteria.

4.     Moreover, Caldwell's personal involvement in the boxing promoter's private business was inappropriate.  As a portfolio manager, Caldwell was supposed to be allocating the Funds' money based on the objective merits of the prospective companies and the investments, not acting to personally ingratiate himself with a boxing promoter or attempt to assist in the management of a private company.  The Funds did not have a venture-capital or activist-investor strategy.  The Trustees should never have allowed Caldwell to use almost $1 billion of the Funds' assets to participate in boxing promoter "fantasy camp."

5.     In fact, in June 2014, Caldwell actually resigned from the Funds, supposedly to join one of Haymon's companies as "Chief Operating Officer."  Caldwell's resignation raises issues over whether he was fired by the Trustees for making these investments, or whether he had a *quid pro quo* agreement with Haymon's company.  In either case, the Trustees have not acted properly.

6.     According to several lawsuits, Haymon used the approximately $925 million invested by the Funds to engage in wide-ranging anti-competitive and illegal acts.  Haymon allegedly spent hundreds of millions to purchase boxers' contracts at a loss in an effort to dominate and control the market.  His practices have been accused of violating the Sherman Act, the Muhammad Ali Boxing Reform Act, and various state laws that regulate boxing managers and promoters.  Recently, an independent association of State Boxing Commissioners has asked the U.S. Department of Justice to investigate Haymon's business practices.

7.     The Funds' investors remained in the dark about these events.  The Funds made no meaningful disclosure about their investment in this company, or how this investment was different from, or carried risks that were different from, the disclosed strategies in the Prospectuses.  The Funds also did not disclose Caldwell's personal relationship with Haymon or

3

how that relationship influenced the decision to invest in Haymon's company—or how such a relationship might present a conflict of interest.  The Funds' investors had no reason to suspect or question any of the investments made.

8.     The Funds' only disclosure of its private investments consisted of listing the investments on its annual and semi-annual financial statements.  However, the Funds' disclosure of the size of its position in the company, the dates of purchase, and the investments' costs changed over time.  Moreover, the Funds' investment was made through an innocuously named "holding company" that did not identify Haymon or any material fact about Haymon's business.

9.     According to public reports, the Trustees knowingly gave prior authorization and approval for these private investments in Haymon's company of approximately $925 million for the Funds.  According to the Prospectuses, the Trustees are responsible for the management and oversight of the risks of the Funds.  Even if they did not give prior authorization for the investments, they had strict duties to supervise the Funds' investments to ensure compliance with its investment objectives and restrictions.  The Trustees also had duties to supervise the conflicts and ethical conduct of its portfolio managers.   Moreover, the Investment Managers of the Funds had these same duties and were responsible for the acts of the portfolio manager.

10.     Whether the Trustees and Investment Managers knew that Caldwell was directing $925 million worth of Fund assets into a high-risk start-up that was designed to violate the antitrust laws, or whether they simply failed to engage in the necessary diligence to uncover that fact, they should at least have recognized that this investment was well outside the bounds of the Funds' investment strategy and presented an outsize risk that should, at the very least, be disclosed in full to investors.  Yet the Trustees and Investment Managers did neither.

11.     By approving the investments, or failing to detect and prevent them, the Trustees and Investment Managers committed willful and grossly negligent breaches of fiduciary and contractual duties towards the Funds' shareholders.  These breaches have resulted in at least $300 million in losses reported by the Funds so far, and could result in a total loss—all $925 million—if Haymon's venture dissolves.  Indeed, if Haymon is indicted, then the full $925 million investment will almost certainly be worthless.

12.     Through this action, Plaintiffs seek to recover on behalf of the Funds for these and other losses caused by the Defendants' willful and/or grossly negligent breaches of fiduciary and contractual duties, and to restore the lost value through corporate waste to the Funds.

13.     Demand has not been made and is excusable under applicable law because the Defendants, who are the Trustees and Investment Managers of the Fund, were directly responsible for the misconduct and losses alleged herein, and any demand that they sue themselves for $300 million (or as much as $925 million) to restore the lost value to the Funds for their wrongful acts would be futile.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over this action pursuant 28 U.S.C. §1332 because Defendants are citizens of Kansas, while Plaintiffs are citizens of Illinois and Idaho. Additionally, the amount in controversy in this case exceeds $75,000.

15.     Venue is proper pursuant to 28 U.S.C. §1391 because Defendants reside and/or have their principal offices located in this district.

# PARTIES

## A.   PLAINTIFFS

16.     Plaintiff Saket Kapoor is a resident of Chicago, Illinois.   He is and has been a shareholder of the W&R Fund since July 2015, which coincides with the time of the transaction and its cover-up which are the subject of this complaint, and before its losses and revelation to the public.

17.     Plaintiff Peter Brockett is a resident of Boise, Idaho.   He is and has been a shareholder of the Ivy Fund and W&R Fund since July 2015, which coincides with the time of the transaction and its cover-up which are the subject of this complaint, and before its losses and revelation to the public.

18.     Plaintiff Hieu Phan is a resident of Chicago, Illinois.   He has been a shareholder of the Ivy Fund since December 2012, before the time of the transaction which is the subject of this complaint.

## B.   NOMINAL DEFENDANTS

19.     Nominal defendant Ivy Funds ("Ivy Funds Trust") is a Delaware Business Trust organized on November 13, 2008.   Ivy Trust has a Board of Trustees that is responsible for its management.    Its principal office is in Overland Park, Kansas, and it is responsible for the management of the Ivy Fund.

20.     Nominal defendant Waddell & Reed Advisors Funds ("W&R Funds Trust") is a Delaware Business Trust organized on October 14, 2008.    W&R Funds Trust has a Board of Trustees that is responsible for its management.    Its principal office is in Overland Park, Kansas, and it is responsible for the management of the W&R Fund.

## C.   DEFENDANTS

21.     Defendant Ivy Investment Management Company ("Ivy Management") has a

principal office located in Overland Park, Kansas.  Ivy Management is a registered investment adviser with the Securities and Exchange Commission ("SEC"), and is the Investment Advisor for the Ivy Fund.  Ivy Management is a subsidiary under the control of Waddell & Reed Financial Inc. ("WDR"), a public company with its principal office in Overland Park, Kansas.

22.     Defendant Waddell & Reed Investment Management Company ("W&R Management") has a principal office located in Overland Park, Kansas.  W&R Management is and was at all relevant times a registered investment adviser with the SEC, and the Investment Advisor for the W&R Fund.  W&R Management is a subsidiary under WDR's control.

23.     Defendant Henry J. Herrmann is and was at all relevant times a Trustee of both the Ivy Trust and W&R Trust, and the President of both Ivy Trust and W&R Trust.  He is and was at all relevant times also President, Chief Executive Officer and Chairman of both Ivy Management and W&R Management.  He also is and was at all relevant times Chairman of WDR, which owns both Ivy Trust and W&R Trust.

24.     Defendant Michael L. Avery is and was at all relevant times a Trustee of the W&R Trust.  He is and was at all relevant times also Executive Vice President of both Ivy Management and W&R Management.   He is and was at all relevant times also President of WDR, which owns both Ivy Trust and W&R Trust.  Additionally, since 1997, he has been a portfolio manager for both the Ivy Fund and W&R Fund and was directly responsible for the investments and reporting to investors.

25.     The Trustees of the Ivy Trust are and were at all relevant times Defendants Henry J. Hermann, Jarold W. Boettcher, James D. Gressett, Joseph Harroz Jr., Glendon E. Johnson Jr., Eleanor B. Schwartz, Michael G. Smith and Edward G. Tighe.   All have principal offices in Kansas.

26.     The Trustees of the W&R Trust are and were at all relevant times Defendants Henry J. Herrmann, Michael L. Avery, Jarold W. Boettcher, Joseph Harroz Jr., Joseph W. Kauten, James M. Concannon, John A. Dillingham, David P. Gardner, Robert L. Hechler, Albert W. Herman, Frank J. Ross Jr. and Eleanor B. Schwartz.[1]  All have principal offices in Kansas.

## SUBSTANTIVE ALLEGATIONS

### A.     The Trustees' Duties to Manage and Monitor
### The Funds' Investments, Risk and Compliance

27.     The Funds are open-end mutual funds registered under the Investment Company Act of 1940.  The Funds offer shares to investors as a separate series of securities issued by their respective Trusts.  The Trusts are owned by WDR, which markets a family of mutual funds to the public under the names "Waddell & Reed" and "Ivy Funds."

28.     The Trustees of the Trusts are responsible for the management and operation of the Funds, and have appointed officers to assist with its day-to-day operations.  For instance, the Prospectuses of the Funds provide as follows:

**Trustees and Officers**

The Trust is governed by its Board, which currently is comprised of eight individuals. The Board is responsible for the overall management of the Trust and the Funds, which includes general oversight and review of the Funds' investment activities, in accordance with federal law and the law of the State of  Delaware, as well as the stated policies of the Funds.  The Board has appointed officers of the Trust and delegated to them the management of the **day-to-day operations** of the Funds, based on policies reviewed and approved by the Board, **with general oversight by the Board**.

29.     The Ivy Trust and W&R Trust had, during relevant times, the same officers to whom they delegated management of the Funds' day-to-day operations.  These officers were Herman J. Herrmann, President; Mara D. Herrington, Vice President and Secretary; Wendy J. Hills, Vice President, General Counsel and Assistant Secretary; Joseph W. Kauten, Vice

---

[1]     Defendants Gardner and Hechler were Trustees during a portion of the period of time relevant to this case, but are no longer Trustees.

President, Treasurer and Chief Accounting Officer; Scott J. Schneider, Vice President and Chief

Compliance Officer; and Philip A. Shipp, Assistant Secretary.

30.     According to the Funds' Prospectuses, these officers are "responsible for the day-

to-day business decisions."   Through these officers, the Trustees controlled and oversaw the

Funds' operations and management, including matters relating to investments, compliance and

accounting.

31.     According to the Prospectuses, the Trustees have these specific responsibilities:

*Risk Oversight*

Consistent with its responsibility for oversight of the Trust and its Funds, the Board
oversees the management of risks relating to the administration and operation of the Trust
and the Funds. The Board performs this risk management oversight directly and, as to
certain matters, directly through its committees and through its Independent Trustees.
The following provides an overview of the principal, but not all, aspects of the Board's
oversight of risk management for the Trust and the Funds.

In general, a Fund's risks include, among other things, investment risk, credit risk,
liquidity risk, valuation risk, operational risk and regulatory compliance risk.  The Board
has adopted, and periodically reviews, policies and procedures designed to address these
and other risks to the Trust and the Funds.  In addition, under the general oversight of the
Board, [  ], each Fund's Investment Manager and other service providers to the Trust
have themselves adopted a variety of policies, procedures and controls designed to
address particular risks of the Funds.  Different processes, procedures and controls are
employed with respect to different types of risks. The Board also oversees risk
management for the Trust and the Funds through review of regular reports, presentations
and other information from officers of the Trust and other persons.

Senior officers of the Trust, senior officers of [Manager], [  ] and [  ] collectively,
Waddell), and the Funds' CCO regularly report to the Board on a range of matters,
including those relating to risk management. The Board also regularly receives reports
from [Manager] with respect to the investments and securities trading of the Funds,
reports from Fund management personnel regarding valuation procedures and reports
from management's Valuation Committee regarding the valuation of particular securities.
In addition to regular reports from Waddell, the Board also receives reports regarding
other service providers to the Trust, either directly or through Waddell or the Funds'
CCO, on a periodic or regular basis. At least annually, the Board receives a report from
the Funds' CCO regarding the effectiveness of the Funds' compliance program. Also, on
an annual basis, the Board receives reports, presentations and other information from
Waddell in connection with the Board's consideration of the renewal of each of the

Trust's agreements with Waddell and the Trust's distribution plans under Rule 12b-1 under the 1940 Act.

Senior officers of the Trust and senior officers of Waddell also report regularly to the Audit Committee on Fund valuation matters and on the Trust's internal controls and accounting and financial reporting policies and practices. Waddell compliance and internal audit personnel also report regularly to the Audit Committee. In addition, the Audit Committee receives regular reports from the Trust's independent registered public accounting firm on internal control and financial reporting matters. On at least a quarterly basis, the Independent Trustees meet separately with the Funds' CCO to discuss matters relating to the Funds' compliance program.

32.     According to the Funds' Prospectuses, the Trustees not only have adopted policies for managing the Funds' various risks, but regularly receive regular reports relating to the Funds' risk management.  Based on these duties, the Trustees would reasonably be expected to have policies for prior approval of substantial investments in private companies, or investments that otherwise deviate from the Funds' ordinary investment strategy.  The Trustees would also be reasonably expected to regularly review the risks of positions held by the Funds in private companies, which are generally considered riskier than publicly traded securities.

33.     According to the Prospectuses of the Funds, the Trustees regularly receive reports from the investment manager on the "investments and securities trading of the Funds" and reports "regarding the valuation of particular securities."  The Trustees also receive reports regarding the Funds' compliance policies, reports from the Funds' audit committee on valuation matters and internal controls, and reports from outside accountants on "internal control and financial reporting matters."  Thus, the Trustees would be expected to regularly review the risks of positions held by the Funds in private companies, and any valuation or financial reporting issues or discrepancies that might arise relating to them.

34.     In addition to the Trustees, the Funds were managed by investment managers, namely Ivy Management and W&R Management. Both Ivy Management and W&R

Management had virtually identical Investment Management Agreements ("IMA") with the Trusts.

35.     The IMAs provide that Ivy Management and W&R Management have the duty to provide investment advice for the Funds, and to "continuously supervise" the Funds' investments.   The IMAs, at Section II.A.1. also required that Ivy Management and W&R Management to:

> obtain and evaluate pertinent information about significant developments and economic, statistical and financial data, domestic, foreign or otherwise, whether affecting the economy generally or one or more of the portfolios of the Fund, and whether concerning the individual companies whose securities or other financial instruments are included in the Funds' portfolios or the industries in which they engage, or with respect to securities or other financial instruments which [Manager] considers desirable for inclusion in the Funds' portfolio[.]

36.     This provision requires that Ivy Management and W&R Management perform thorough and sufficient research due diligence on any prospective company or securities that is a prospective investment for the Funds.   This fundamental duty to the Funds existed regardless, but it is a separately delineated duty under the IMAs.

37.     Additionally, the IMAs provide:

C.  [Manager] shall make appropriate and regular reports to the Board of Trustees of the Trust on the actions it takes pursuant to Section II.A. or B. above.  Any investment programs furnished by [Manager] under this section, or any supervisory function taken hereunder by [Manager], shall at all times conform to and be in accordance with any requirements imposed by:

1.      the provisions of the Investment Company Act of 1940 and any rules or regulations in force thereunder;

2.      any other applicable provision of law;

3.      the provisions of the Declaration of Trust of the Trust as amended from time to time;

4.      the provisions of the Bylaws of the Trust, as amended from time to time; and

5.       the terms of the registration statement of the Trust, as applicable to the Funds, as amended from time to time, under the Securities Act of 1933 and the Investment Company Act of 1940.

D.  Any investment programs furnished by [Manager] under this section or any supervisory functions taken hereunder by [Manager] shall at all times be subject to any directions of the Board of Trustees of the Trust, its Executive Committee, or any committee or officer of the Trust acting pursuant to authority given by the Board of Trustees.

38.     These IMA provisions reflect that Ivy Management and W&R Management were required to conduct their investment activity for the Funds consistent with the Funds' governing documents and its Prospectuses filed in its registration statements.  In other words, any investments done by Ivy Management and W&R Management that violated the terms of the Funds' Prospectuses also violated the IMA.

39.     Moreover, the IMAs for both the Ivy Trust and W&R Trust further reflect the Trustees had direct involvement in and supervision over Ivy Management's and W&R Management's performance of their duties.  The Trustees also received regular reports from Ivy Management and W&R Management about their investments and investment programs for the Funds.

40.     Finally, the Trustees also retained substantial control over Ivy Management and W&R Management.  For both Trusts, one of the Trustees, Herrmann, was the Chairman, CEO, President and a control person of the investment manager.  For W&R Trust, Avery was also an officer and control person of W&R Management.  Also, Wendy J. Hills, who is the Vice President, General Counsel and Assistant Secretary for both Trusts, is also Senior Vice President, Secretary, General Counsel and a control person of the two investment managers.

41.      In addition, both IMAs contain this broad provision at the outset which explicitly state that the investment manager is under the Trustees' control:

<u>In General</u>

[Manager] agrees to act as investment adviser to each Fund with respect to the investment of its assets and in general to supervise the investments of each Fund, subject at all times to the direction and **control of the Board of Trustees of the Trust,** all as more fully set forth herein. (emphasis added)

42.     In short, the Trustees had substantial control of, direct involvement in and oversight over the day-to-day management and investments of the Funds, including all aspects of the purchases and sales, the investment research, the valuation, the financial reporting, compliance and auditing.   The Trustees also retained substantial control over the individual performing these functions as their officers or for the investment managers, and were required to stay informed regarding these matters to comply with their publicly disclosed duties.

**B.     The Funds' $925 Million Investment in the
        "Shady" Boxing Promoter's Company**

43.     Beginning in or about April 2013, the Funds began to invest in private securities of  Media Group Holdings LLC ("MGH").   MGH is purportedly a "shell" holding company owned by the Funds or WDR which, in turn, invested in one more business entities owned and controlled by Alan Haymon.  Haymon is a former music producer who, with the Funds' financial backing, has turned to boxing management and promotion.

44.     The driving force behind the Funds' investment in MGH was Ryan Caldwell, one of the two portfolio managers of the Funds.  According to a public report, Caldwell had an avid interest in boxing, and was closely following the industry.   He also had been looking for opportunities to invest in sports or other live events, and was referred to Haymon.  At or about the same time, Caldwell had discussions with a contact at a hedge fund that had declined to invest in a boxing promotion company because revenues went to the fighters, making the investment unprofitable.

45.     From his discussions, Caldwell learned about Haymon's business plans.  Haymon intended to buy up the management deals for a "critical mass" of fighters and use their leverage to dictate profits.  Caldwell came to believe that Haymon's business plan, which was new and untested, could become very profitable.  Caldwell has even stated that, after Haymon told Caldwell how much investment capital was needed, Caldwell insisted that Haymon take much more to "weather the storm."  In other words, Caldwell knew at the time he was investing the Funds into MGH that Haymon's plan was untested and that the Haymon companies intended to spend hundreds of millions of dollars investing in "loss leaders."

46.     According to public reports, Caldwell went to the Trustees for approval to make the investment in MGH.  He reportedly discussed Haymon's business strategy and plans to the Trustees so that they knew that Haymon planned to make "loss leading" purchases of fighters' contracts.  Caldwell reportedly described the investment as "an undervalued call option, with the high risk but very high return."  And the Trustees, notwithstanding these clear risks and the fact that the MGH investment represented a profound deviation from the Funds' professed investment strategy, approved this investment and were "prepared to lose it all."

47.     Not only did the Trustees authorize the MGH investments, but the Trustees were also involved in the structuring of their investment.  The Trustees approved one or more Letters of Intent with Haymon's companies for the MGH investment; they established and/or approved of the creation of MGH to hold their investment; and they knew and approved of the negotiated terms of the MGH-related agreements.

48.     According to public reports, WDR, the Funds or the Trustees were also given a board seat on Haymon companies to protect their investment.  In light of the obvious conflict of

interest, Caldwell was deliberately excluded from officially taking any active role in management.

49.     In total, according to recent financial statements filed by the Funds, the following investments were in MGH:

**The Ivy Fund**

| Date | Security | Cost |
|------|----------|------|
| 4-23-13 | 640 MGH Series H | $448,211,000 |
| 7-12-13 | 381 MGH Series I | $209,901,000 |
| 8-29-13 | 80 MGH Series T | $172,543,000 |
| | **Total:** | **$830,655,000** |

**The W&R Fund**

| Date | Security | Cost |
|------|----------|------|
| 4-23-13 | 73 MGH Series H | $50,896,000 |
| 7-12-13 | 43 MGH Series I | $23,835,000 |
| 8-29-13 | 9 MGH Series T | $19,953,000 |
| | **Total:** | **$94,325,000** |

50.     Unfortunately, while the Funds did occasionally identify MGH on their annual and semi-annual financial statements, they did not make any material disclosures about MGH, what it was, or what the underlying business or investment risk was to investors.  For example, there was no disclosure that MGH was a holding company owned by WDR or the Funds to make venture capital investments.  There was also no disclosure that MGH, in turn, had invested in Haymon's companies.  In short, investors had no idea that the Funds had deviated into private venture capital investing—let alone antitrust-law-violating boxing promotion—with investor money.

51.     Additionally, the Funds' reporting on its financial statements of its investment in MGH was inconsistent and evolved over time:

The Ivy Fund's Erroneous MGH Reporting

- In its semi-annual report for the period ending September 30, 2013—the first report after the investment was made—the Ivy Fund reported that it held 381 shares of MGH purchased April 23, 2013 at a cost of $258 million. **No mention was made of the July 2013 or August 2013 investments which totaled another $572 million.**

- In its annual report for the period ending March 31, 2014, the Ivy Fund reported that it held 381 shares of MGH purchased on April 23, 2013 at a cost of $818 million. **No mention was made of any July 2013 or August 2013 investments.**

- **It was not until the March 31, 2015 annual report (filed on June 4, 2015)** that the Ivy Fund reported finally the three separate purchase dates of MGH, the three separate Series of its MGH holdings and the total cost of $830 million.

W&R Fund's Erroneous MGH Reporting

- In its semi-annual report for the period ending September 30, 2013—the first report after the investment was made—**there was no mention at all of any investment by the W&R Fund in MGH.** There was a reference to a 43 share investment in Ithaca Holdings LLC on April 23, 2013 for a cost of only $14.7 million, which is $36 million less than the MGH investment of $50.89 million later reported to have been made on the same date.

- In its semi-annual report for the period ending December 31, 2013, the W&R Fund reported for the first time that it held 43 shares of MGH purchased on April 23, 2013 at a cost of $92.9 million. **No mention was made of any July 2013 or August 2013 investments.**

- **It was not until the December 31, 2014 semi-annual report (filed on March 6, 2015)** that the W&R Fund reported that there were three separate purchase dates of MGH, and three separate Series of its MGH holdings.

52.     The Trustees were responsible for the Funds' financial reporting. Herrmann and other trustees who were officers of the Trusts signed and certified the Funds' filings of their annual and semi-annual financial statements with the SEC. The Trustees knew or should have known of these financial reporting failures, inconsistencies and material discrepancies. Moreover, the Funds' managers and officers, under the supervision and control of the Trustees, knew about or should have detected these erroneous reports.

53.     If these discrepancies in the Funds' annual and semi-annual financial reports were due to funding commitments of the Funds which were not yet made to MGH, then the Funds failed to disclose these material liabilities to investors.

**C.     The $925 Million of MGH Investments**
**Breached Fiduciary Duties to the Funds**

54.     The Funds' $925 million investments in MGH breached fiduciary duties to the Funds.  The nature of the private venture investments in MGH violated the stated investment objectives and strategies detailed in the Funds' Prospectuses.  The Funds' investors would never have known or expected that their money was exposed to private venture capital investing or the risks of business failure associated with these types of investments.  The Funds also failed to provide truthful and accurate material disclosure about their MGH investments, made erroneous reports in their financial statements, and failed to disclose or caution investors in any way about the risks associated with its MGH investments.  The MGH investments, therefore, breached fiduciary duties owed to the Funds' investors.

55.     The Funds' Prospectuses provide the following description of its Principal Investment Strategy:

**Principal Investment Strategies**

[The Fund] seeks to achieve its objective by allocating its assets primarily among stocks, bonds and short-term instruments of issuers in markets around the globe, as well as in derivative instruments, precious metals and investments with exposure to various foreign currencies.  The Fund may invest its assets in any market that [Manager] believes can offer a high probability of return or, alternatively, can provide a high degree of relative safety in uncertain times. Dependent on its outlook for the U.S. and global economies, [Manager] identifies investment themes and then focuses its strategy on allocating the Fund's assets among stocks, bonds, cash, precious metals, currency and derivative instruments, including derivatives traded over-the-counter or on exchanges. After determining these allocations, [Manager] seeks attractive opportunities within each market by focusing generally on issuers in countries, sectors and companies with strong cash flow streams, the ability to return capital to shareholders and low balance sheet leverage. The Fund, however, also may invest in issuers with higher balance sheet

leverage if [Manager] believes that the Fund will be appropriately compensated for the increased risk.

"Stocks" include equity securities of all types, although [Manager] typically emphasizes growth potential in selecting stocks by focusing on what it believes are steady-growth companies that fit [Manager's] criteria for sustainable competitive advantage and that [Manager] believes are positioned to benefit from continued global rebalancing and the globally emerging middle class, as well as companies that benefit from a renewed infrastructure cycle and innovations in technology. Growth stocks are those whose earnings [Manager] believes are likely to grow faster than the economy. **The Fund may invest in securities issued by companies of any size, but primarily focuses on securities issued by large capitalization companies.** [Manager] generally focuses on companies that are growing, innovating, improving margins, returning capital through dividend growth or share buybacks and/or offering what [Manager] believes to be sustainable high free cash flow.

56.     These provisions of the Funds' Prospectuses were egregiously violated by the $925 million of MGH investments in several respects.  First, there is nothing in the Prospectus that discussed or contemplated that the Funds will make investments in private companies. While the language does refer to "equities of all types," the context of the discussion of the Funds' strategy is focused on securities traded in markets.  There is no reference or mention anywhere that the Funds specifically intended to engage in the private structuring and negotiation of private stock investments.

57.     Second, and relatedly, the Prospectuses do not discuss or disclose that the Funds will engage in a non-passive private venture strategy, and do not disclose that the Funds are exposed to the specific risks which arise from this high-risk and speculative kind of investing. The Funds not only negotiated private agreements for their investment in MGH, they negotiated a board seat and apparently participated and/or consulted with Haymon on business strategy. This type of activist investing carries substantial risk that the Funds were not qualified to execute.  For example, a more qualified venture capital investor might have structured the Funds' investment as a note secured by hard assets to prevent against losses, with an option to convert to

equity for a reward on the upside.  Based on the Prospectuses' disclosures, no investor would ever expect that the Funds would engage in this type of activist investing.

58.     Third, the Funds' investment in MGH violated express statements in the Prospectuses about the quality of their stocks and companies in which they would invest.  The Prospectuses stated that the Funds would focus primarily on "securities    issued    by    large capitalization companies," securities which "offer a high probability of return or, alternatively, can provide a high degree of relative safety in uncertain times," and securities with "strong cash flow streams," and "sustainable high free cash flow."   In short, the Prospectuses describe profitable, high quality cash-generating companies.

59.     The $925 million of MGH investments made by the Funds violate these specific disclosures the most because Haymon's companies were start-up companies that were new to the industry and were spending hundreds of millions of dollars in "loss leading" with no certainty of ever earning profits.   Haymon's business plans, which were known to the Trustees, were to engage in huge expenditures that would be expected to run at a loss for three to five years.  The Trustees approved giving Haymon more capital than he even had requested, knowing that there would be substantial immediate losses in the near future.  The Trustees knew that they were essentially throwing investor money away when making the investment in MGH, for a long-shot bet, or "call option" as Caldwell described it, at an upside.  The nature and magnitude of this type of risk from MGH is contrary to the Prospectuses' plain language about the quality of investments that the Funds will make.

60.     Fourth, the Funds' $925 million investment in MGH violated the Funds' Prospectuses and IMAs because the investment was obviously not properly and thoroughly researched and vetted.   The Trustees and Managers owed duties to engage in due diligence on

19

the companies and investments made for the Funds.  Had proper vetting and diligence been done on Haymon and his business plans, the Funds would have known to pass on the investment in MGH.

61.     According to several lawsuits that have been filed, Haymon's business plan was for all intents and purposes illegal.  His plan to expend hundreds of millions of dollars to purchase fighters' contracts ran afoul of the Sherman Act, the Muhammad Ali Boxing Reform Act, and various state laws which regulate boxing managers and promoters.  Recently, an independent association of State Boxing Commissioners has asked the U.S. Department of Justice to investigate Haymon's business practices.

62.     The Muhammad Ali Boxing Reform Act, 15 U.S.C. § 6038 (b) (the "Ali Act") requires that there be a strict "firewall" between boxing promoters and managers.  This "firewall" is also found in state regulations of boxing.  The rule protects fighters by preventing their managers from receiving compensation for promotions which could lead to their acting contrary to the fighters' needs and best interests.  Haymon has allegedly been purchasing the contracts to manage fighter to leverage compensation for the promotion of their fights.  In short, such a business plan is illegal.

63.     According to public reports, Caldwell, the Funds' portfolio manager, was initially attracted to Haymon's business plan because Haymon sought to monopolize boxing and leverage his control over fighters.  In other words, Caldwell was attracted to an illegal scheme.  Had Caldwell or the Trustees performed proper research and due diligence on Haymon and his business plans, they would have detected this potential illegality and recognized the negative consequences to the Funds of investing in such business practices.

64.     Fifth, the Trustees should have rejected the MGH investment because of the conflict of interest and personal motivations of Caldwell which were driving the investment. Caldwell had a strong personal interest in boxing.  He reportedly attended Haymon's boxing events, and consulted with Haymon on his businesses.  Caldwell reportedly attended business meetings with NBC on Haymon's behalf to assist in the negotiation and closing of a promotional agreement.   Caldwell also procured for Haymon's companies a lawyer he knew, convincing him to leave his law practice to do so.

65.     In fact, in June 2014, Caldwell purportedly resigned from the Funds, to join Haymon's company, Premiere Boxing Company, as "Chief Operating Officer."  His resignation raises issues over whether, in truth, he was "fired" by the Trustees for making the MGH investments, or whether he had a *quid pro quo* agreement with Haymon.

66.     The Funds has a Code of Ethics policy which states that its Trustees, the Trust's officers, the Funds' managers and employees have a fiduciary duty towards their clients, which, in turn, requires them to place the interests of the clients first.  The Code also requires that they avoid any actual or potential conflicts of interest, and refrain from transactions where there is a personal advantage or benefit.  Caldwell's investment in MGH for the Funds was tainted by his own personal advantage and interest in boxing, and obtaining some personal advantage from Haymon and his companies.  The fact that he resigned to become Chief Operating Officer for one of Haymon's companies is evidence of his personal motivation from the start and his violation of the Funds' Code of Ethics.

67.     In sum, Defendants willfully and grossly negligently breached their fiduciary and/or contractual duties to the Funds by investing $925 million in MGH, and by failing to disclose (and making erroneous disclosures) to investors the true nature and risks of this

investment.   As a result of these breaches, the Funds have recently reported at least **$300 million** in losses from its MGH investments.   These losses have negatively impacted the Funds' performance.

68.     Moreover, the Funds' holdings of MGH, presently valued at approximately **$530 million**, have questionable value and may be worthless considering Haymon's possible indictment by the U.S. Department of Justice and the outstanding lawsuits against him.   If Haymon is indicted, or his business practices are restricted or foreclosed by any state boxing regulators for violating the "firewall" under Ali Act, then MGH will lose all of its value and the Funds' losses will increase to the full $925 million.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

69.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

70.     Plaintiffs bring this action derivatively for the benefit of the Funds to redress injuries suffered and injuries that continue to be suffered as a direct and proximate result of the misconduct alleged herein.   The Trusts are named as nominal defendants solely in a derivative capacity.

71.     Plaintiffs will fairly and adequately represent the interests of the shareholders in enforcing and prosecuting their rights.

72.     Plaintiffs each made a substantial investment in the Funds.   They have owned their shares continuously throughout the period in which Defendants' wrongful acts occurred, and they continue to own their shares, thus giving them standing to pursue this action.

73.     This action is not being used by Plaintiffs to gain any personal advantage, nor do Plaintiffs maintain any personal agenda other than seeking to remedy the wrong that has been

done.   To this end, Plaintiffs have taken steps to file this action and have retained counsel experienced in derivative litigation and corporate governance actions.

74.     Plaintiffs did not make a demand on the Trusts to take remedial action on behalf of the Funds against the Defendants because such a demand would have been a futile, wasteful, and useless act.   The Board of Trustees themselves participated in, approved, and/or permitted the wrongs alleged herein and concealed and disguised those wrongs—that is, the Trustees are the individual Defendants in this action who were responsible for managing, approving, structuring, monitoring, valuing and reporting on the Funds' improper $925 million investment, as well as the disclosures in the Fund's registration statements and prospectuses.

75.      It is the bad acts and grossly negligent management decisions of the Trustees that constitute the breaches of fiduciary duty that harmed the Funds' shareholders.

76.     It would therefore be futile to make a demand on the Trustees to sue themselves for the $300 million (or as much as $925 million) of losses and/or to restore this lost value to the Funds.

77.     Additionally, the Board of Trustees also has control over the investment managers, Ivy Management and W&R Management, which were also involved in the bad acts and grossly negligent management decisions which constituted the breaches of fiduciary duty that harmed the Funds' shareholders.

78.     Defendant Herrmann is a Trustee for both Trusts and the President of both Trusts. He is also the Chairman, President and CEO of Ivy Management and W&R Management, which he controls.   In view of Herrmann's control, and the other overlap in management of the Trusts and investment managers, it would therefore be futile to make a demand on the Trusts to sue the

investment managers for the $300 million (or as much as $925 million) of losses and/or to restore this lost value to the Funds.

79.     Defendants are personally and directly conflicted by their actions such that they could not have been reasonably expected to respond to a demand in good faith.  Defendants are not disinterested parties and lack sufficient independence to exercise business judgment in the best interests of the shareholders as alleged herein.

80.     For the foregoing reasons, demand is excused under applicable law.

## COUNT I

### BREACH OF FIDUCIARY DUTIES
### (Against All Defendants)

81.     Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

82.     Defendants, who were the Board of Trustees members and the Investor Advisor to the Funds, owed fiduciary duties of care and loyalty to the Funds in managing its affairs.  These duties are and were set forth in the Trust's prospectuses, IMA and other documents in its filings with the SEC.

83.     As alleged above, Defendants each breached their fiduciary duties to the Funds through willful misconduct and/or gross negligence.

84.     Plaintiffs did not make demand on the Boards of Trustees for the respective Funds because such demand would be futile.  The Boards of Trustees are made up of the primary wrongdoers who engaged in these breaches of fiduciary duty and control the Investment Advisor.

85.     As a direct and proximate result of the breaches of fiduciary duty by Defendants, the Funds have sustained substantial harm and damage.

86.     Defendants are liable to the Funds as a result of the acts alleged herein.

87.     There is no adequate remedy at law.

## COUNT II

### BREACH OF CONTRACT
### (Against Defendants Ivy Management and W&R Management)

88.     Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

89.     Defendants Ivy Management and W&R Management had contractual duties to their respective Funds under an Investment Management Agreement which provided, in materially identical language, as follows:

II. <u>Duties of [Manager] with respect to investment of assets of the Trust</u>

A.      [Manager] shall regularly provide investment advice to each Fund and shall, subject to the succeeding provisions of this section, continuously supervise the investment and reinvestment of cash, securities or other property comprising the assets of the investment portfolios of each Fund; and in furtherance thereof, WRIMCO shall as to each Fund:

1.  obtain and evaluate pertinent information about significant developments and economic, statistical and financial data, domestic, foreign or otherwise, whether affecting the economy generally or one or more of the portfolios of the Fund, and whether concerning the individual companies whose securities or other financial instruments are included in the Funds' portfolios or the industries in which they engage, or with respect to securities or other financial instruments which [Manager] considers desirable for inclusion in the Funds' portfolio;

***

3. determine what securities shall be purchased or sold by the Fund; and

***

B. [Manager] shall make appropriate and regular reports to the Board of Trustees of the Trust on the actions it takes pursuant to Section II.A. above.  Any investment programs furnished by [Manager] under this section, or any supervisory function taken hereunder by [Manager] shall at all times conform to and be in accordance with any requirements imposed by:

1. the provisions of the Investment Company Act of 1940 Act, as amended ("1940 Act") and any rules or regulations in force thereunder;

***

5. the terms of the registration statements of the Trust, as amended from time to time, under the Securities Act of 1933 and the 1940 Act.

90.    By reason of the willful and/or grossly negligent misconduct alleged herein, defendants Ivy Management and W&R Management breached these contractual duties owed to their respective Funds.

91.    These breaches caused proximate harm to the Funds.

92.    There is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment on behalf of the Funds against the Defendants, jointly and severally, as set forth herein, as follows:

(i) Declaring that this action is a proper derivative action;

(ii) Ordering that Defendants restore $925 million representing the cost of the MGH investments to the Funds, in exchange for return of the MGH investments held by the Funds, plus prejudgment interest;

(iii) Ordering each of the Defendants to pay restitution and/or compensatory damages in favor of the Funds of not less than $300 million for current losses as well as restitution and/or compensatory damages for any additional losses suffered through trial, plus prejudgment interest;

(iv) Ordering that Ivy Management and Waddell & Reed Management return all management fees, broker/dealer fees and other fees paid by the Funds during the period that it breached its fiduciary duties;

(v) Awarding Plaintiffs their costs and disbursements and reasonable allowances for fees of Plaintiffs' counsel and experts and reimbursement of expenses; and

(vi) Granting Plaintiffs and the Fund such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial for any and all Counts for which a trial by jury is permitted by law.

**SWANSON MIDGLEY, LLC**

By: /s/ John J. Miller
John J. Miller, #15377
4600 Madison Avenue
Suite 1100
Kansas City, MO 64112
Telephone: (816) 842-6100
Facsimile: (816) 842-0013
*jmiller@swansonmidgley.com*

**ZAMANSKY LLC**
Jacob H. Zamansky (*pro hac vice* pending)
Samuel E. Bonderoff (*pro hac vice* pending)
Edward H. Glenn Jr. (*pro hac vice* pending)
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177
*jake@zamansky.com*

Attorneys for Plaintiffs